1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF TEXAS
 2                         FORT WORTH DIVISION

 3     UNITED STATES OF AMERICA        .   CRIMINAL ACTION NO.
                                       .   4:16-CR-118-A-6
 4     V.                              .
                                       .   Fort Worth, Texas
 5     AMANDA NICOLE RISOVI            .   October 12, 2016
       . . . . . . . . . . . . . . . . .

 6

 7

 8
                         TRANSCRIPT OF PROCEEDINGS
 9                          (Sentencing Hearing)
                     BEFORE THE HONORABLE JOHN MCBRYDE
10                    UNITED STATES DISTRICT JUDGE

11

12

13

14     APPEARANCES:

15     For the Government:         MR. SHAWN SMITH
                                   United States Attorney's Office
16                                 801 Cherry Street, Suite 1700
                                   Fort Worth, Texas  76102-6897
17                                 (817) 252-5200

18     For the Defendant:          MR. STEVEN T. JUMES
                                   Varghese Summersett
19                                 300 Throckmorton, Suite 1650
                                   Fort Worth, Texas  76102
20                                 (817) 203-2220

21     Court Reporter:             MS. ANA P. WARREN
                                   U.S. District Court Reporter
22                                 501 W. 10th Street, Room 502
                                   Fort Worth, Texas  76102-3637
23                                 (817) 850-6681

24
       Proceedings recorded by mechanical stenography; transcript
25     produced by computer-aided transcription.
```

2

*P R O C E E D I N G S*

1

2      (Commencing, 12:10 p.m.)

3           THE COURT:  I'm now calling for sentencing Number

4      4:16-CR-118-A.  It's United States of America versus Amanda

5      Nicole Risovi.

6      Is that the way you pronounce that?

7           MR. JUMES:  It's Risovi, Your Honor.

8           THE COURT:  Risovi.

9      Okay.  And Mr. Smith is here for the government, and

10     Mr. Jumes is here for the defendant.

11     Mr. Risovi, state your full name for the record.

12          DEFENDANT RISOVI:  Amanda Nicole Risovi.

13          THE COURT:  Okay.  You appeared before me on May 26,

14     2016, when you entered a plea of guilty to the offense charged

15     by Count 2 of an information filed in this case on May 18,

16     2016 and the offense to which you pleaded guilty, conspiracy

17     to possess with intent to distribute a controlled substance,

18     and we're here today for sentencing based on the conviction

19     resulting from that plea of guilty.

20     Mr. Jumes, did you and your client receive in a timely

21     manner the presentence report?

22          MR. JUMES:  We have, Your Honor.

23          THE COURT:  Let's see.  There was not an addendum,

24     was there?  I don't see one.

25          MR. SMITH:  There was one, Your Honor.  I just noted

U.S. DISTRICT COURT

3

1    that the government filed a motion for downward departure.

2           THE COURT:  Yes.  There was an addendum.

3       Did the two of you receive the addendum in a timely

4    manner?

5           MR. JUMES:  We did, Your Honor.  It had no impact

6    upon the guidelines.  We have no objection to either the PSR

7    or the addendum.

8           THE COURT:  Did both of you read those items and then

9    discuss them with each other?

10          MR. JUMES:  Yes, Your Honor.

11          THE COURT:  Okay.  There being no objections to the

12   presentence report, the Court adopts as the fact findings of

13   the Court the facts set forth in the presentence report as

14   modified or supplemented by the addendum, and the Court adopts

15   as the conclusions the conclusions expressed in the

16   presentence report as modified or supplemented by the

17   addendum.

18      The Court concludes that the Total Offense Level is 39.

19   That the Criminal History Category is 4.  That the calculated

20   guideline imprisonment range -- well, it would be 360 months

21   to life if the defendant had been charged with her true

22   offense conduct, but because of what she was charged with, it

23   was capped at 240 months.  So that becomes the guideline

24   sentencing range, 240 months.  The supervised release range is

25   three years.  The fine range is $25,000 to $1 million, and a

4

1    special assessment of $100 is mandatory.

2        Okay.  The government has filed a motion for downward

3    departure under 5K1.1.

4        Does the government have any evidence it wishes to offer

5    in support of that?

6            MR. SMITH:  Yes, Your Honor.

7            THE COURT:  Okay.

8            MR. SMITH:  The government calls Agent Finney.

9        BRIAN FINNEY, testified under oath as follows:

10                      **DIRECT EXAMINATION**

11   BY MR. SMITH:

12   Q.  Would you please state your name?

13   A.  My name is Brian Finney.

14   Q.  And your current occupation?

15   A.  I'm a special agent with the Drug Enforcement

16   Administration currently assigned to the Fort Worth, Texas

17   office.

18   Q.  And are you familiar with the case against Ms. Risovi?

19   A.  Yes, I am.

20   Q.  Would you please tell the Court how she's provided

21   substantial assistance to the government?

22   A.  Yes.  Prior to being taken into custody on this

23   investigation, in October of 2015, Mrs. Risovi came to the DEA

24   office and, for several hours, answered questions pertaining

25   to both her knowledge of and her participation in a drug

1    conspiracy.

2        Following her arrest on multiple occasions, she has sat

3    down with investigators and, in a very detailed process, has,

4    again, talked about the knowledge that she obtained while

5    working with multiple people in this drug conspiracy as well

6    as her own participation in the drug conspiracy.

7    Q.  And how many people has her information led to the

8    prosecution of?

9    A.  Her information has assisted in the prosecution of ten

10   people.  Those people would be Tonya Blackwood.  She was one

11   of the main -- Mrs. Risovi was one of the main witnesses

12   against Mrs. Blackwood.  Jackie Waters, again, Mrs. Risovi was

13   one of the main witnesses utilized in charging and convicting

14   Jackie Waters.

15       Nathan Cooper, Mrs. Risovi, again, was one of the main

16   witnesses utilized in charging and convicting Nathan Cooper.

17   Michael Barrett, also known as Motorcycle Mike.  Mrs. Risovi

18   was one of the main witnesses utilized in charging and

19   convicting Mr. Barrett.

20       Albert Cinceros, Billy Leveritt, Billy Skaggs, Michael

21   Young, Charles Deeds and Jessica Judge.  Those are the ten

22   defendants that we utilized her information against.

23   Q.  And most of those, or maybe more like half of those have

24   already been sentenced, is that right, more or less?

25   A.  Yes, sir.  The majority of them have been sentenced either

6

1    in this Court or in front of Judge O'Connor.

2    Q.  And what about future targets?

3    A.  We have, again, accumulated a list of future targets in

4    which we anticipate using her information against 20 future

5    targets.

6            MR. SMITH:  No further questions, Your Honor.

7            THE COURT:  Do you have any questions you want to

8    ask?

9            MR. JUMES:  Just a couple briefly, Your Honor.

10                     **CROSS EXAMINATION**

11   BY MR. JUMES:

12   Q.  Agent Finney, would it be fair to say that, particularly,

13   Co-Defendants Blackwood and Waters are higher up in this

14   conspiracy?

15   A.  Yes, specifically, Blackwood.  Waters worked for

16   Blackwood, but, yes, as well as Michael Barrett.  He was also

17   distributing a large amount of methamphetamine in the Fort

18   Worth area, and her information was utilized in the charging

19   and prosecution of those individuals.

20   Q.  And with respect to her first interview, that was a

21   non-custodial interview with DEA?

22   A.  Yes.  She was brought to our office by a Fort Worth police

23   officer, or she accompanied a Fort Worth police officer up

24   there, and it was non-custodial.  She was not charged at that

25   time.

7

1   Q.  Have you ever sensed that she was deceptive in her

2   dealings with the DEA?

3   A.  No.

4            MR. JUMES:  Thank you for that, and that's all that I

5   have, Your Honor.

6            THE COURT:  Okay.  You can step down.

7            THE WITNESS:  Thank you.

8            THE COURT:  Okay.  You all can come back to the

9   microphone.

10     Okay.  You can make whatever statement you would like to

11  make on behalf of your client at this time.

12     I noticed you filed, on behalf of your client, a motion

13  for downward variance.  Do you have any evidence you want to

14  offer on that beyond what we've just heard?

15           MR. JUMES:  No evidence.  Just a few comments, Your

16  Honor.

17           THE COURT:  Okay.  Why don't you at this time make

18  whatever statement you'd like to make on behalf of your

19  client.

20           MR. JUMES:  Yes, Your Honor.

21     Obviously, I've represented Ms. Risovi for some time now,

22  at least since April.  Even before that, some six months

23  before that, she was already cooperating with the DEA.  What

24  is refreshing about Ms. Risovi is that despite massive

25  challenges in her background, she has repeatedly told me that

1    she made her own bed.  She is lying in it.  Nobody has put a

2    gun to her head, and she realizes she is here with good

3    reason.  Not only has she accepted responsibility and been a

4    substantial cooperator, she is refreshingly grounded and

5    honest about her situation.

6        Having said that, she, like many other defendants you

7    heard about today, has suffered from a massive methamphetamine

8    addiction that at least began at the age of 21.  She had

9    substantial challenges in her upbringing, part of which she

10   took on a parental role at the age of 13 for her younger

11   sister because of her parents' own addictions and behavior,

12   and she also was the victim of significant abuse.

13       But having said all of that, she knows that she is here

14   because of her conduct.  And, Your Honor, we do not take

15   glibly or lightly the fact that her statutory boundary already

16   represents a significant discount from her guideline range.

17       We would ask the Court to consider, however, her longest

18   prison sentence before now has been four years, and we would

19   humbly ask the Court to consider quadrupling that sentence for

20   a 16 year sentence.  In those prior sentences, she only served

21   one year of the four year sentence, and we believe that any

22   progressive regime sanction under even a 16 year sentence,

23   recognizing she's gotten a huge discount, still would

24   accomplish the factors in 3553(a).

25       Thank you, Judge.

1          THE COURT:  Okay.  Ms. Risovi, you can make whatever

2     statement or presentation you would like to make on the

3     subject of mitigation, that is, the things you think the Court

4     should take into account in determining what sentence to

5     impose or on the subject of sentencing more generally.

6          DEFENDANT RISOVI:  Thank you, Your Honor.

7      I had prepared here in my folder eight more examples of

8     defining moments and characteristics from my childhood that

9     were left out of the PSI and the downward variance.  They're

10    very well thought out, and even a few of them had more of a

11    negative impact than what you have there in front of you, but

12    that's exactly the problem and why you won't hear any of them.

13    Beyond the fact that words can't accurately paint the picture

14    necessary, the bigger reason is that today isn't about my

15    childhood and it's not about my parents, things that no child

16    should ever have to encounter.  It's about me as an adult and

17    the consequences of my thoughts and actions.

18     I still have something prepared to say, and I feel it's

19    much more appropriate to this situation.  At some point, I

20    made a conscious decision that I would destroy me better than

21    anyone else ever could, and I've done a really good job of

22    that.  I've done more damage than anyone else.  It's nothing

23    to boast about.  Still my self-harm and self-destructive

24    behaviors were my business until they affected others.  Meth

25    is a method of destruction above most others because, if

1    allowed, it quickly takes over and dictates the path for

2    itself.

3        I cooperated.  Regrettably, I lacked clarity of thought to

4    realize that while I was busy avoiding my own personal issues,

5    I was also contributing to the issues of others.  My

6    tendencies are a challenge that I'm just beginning to address.

7    However, I would never disregard another's well-being as I do

8    mine.  I do everything I can to help out anyone I encounter

9    even to the extent of my own detriment.  Had I had the ability

10   to see the picture beyond myself, I'm confident that my

11   actions would have been different.  As it was, I didn't see

12   drugs as a negative in my life.  So how could I view them as a

13   negative in anyone else's.  I had found something that worked

14   for me mentally and emotionally, and, therefore, I didn't want

15   to see that I was contributing to the chaos around me.

16       Addicts are generally negative and troublesome individuals

17   and drain society as a whole.  They steal from each other and

18   responsible citizens alike.  Because parents are away from the

19   home or under the influence, children are left alone and

20   neglected.  Money that should be used in families pays for

21   drugs, and I can imagine that I am directly causing CPS

22   investigations due to parents being on meth or in jail.

23       My main victim, though, unlike the PSI stated -- it stated

24   I didn't have any victims other than society as a whole.  My

25   main victim was my son.  He missed out on several years that I

1   should have spent with him, and he's heard countless broken

2   promises.  He's 15 now, and he loves me to death.  It's not

3   fair that he should because I haven't done him justice as his

4   mother.

5       None of that speaks anything that I'm proud of, and,

6   actually, at the risk of sounding dramatic, it's tragic,

7   because I'm really better than that.  I'm stronger than that,

8   and I'm certainly more intelligent than that.  At 35 now --

9   this is embarrassing that at 35, I'm going to federal prison,

10  and other than that, my son and that is my greatest

11  accomplishment in life.  I would give anything for a second

12  chance at life, but that's not reality, and maybe I was dealt

13  a bad hand of cards when I was young and I can analyze the

14  who's, the how's, the why's to death, or I can decide how I

15  want to live from here on out.  I can't change my history.  So

16  as I see it, the only option is a turn-around.  This is no

17  legacy for me to leave behind my son and no example.

18      There's a quote from a great philosopher that I like, and

19  it says:  "Adversity is like a strong wind.  I don't mean just

20  that it just holds us back from places that we might otherwise

21  go.  It also tears away from us all the things that cannot be

22  torn so that afterwards we see ourselves as we really are, not

23  merely as we may like to be."

24      I would appreciate the opportunity to participate in the

25  drug program.  I don't have any intention to sit back and wait

1    out my time leaving the BOP in the same condition as I entered

2    it.

3        I would also like to continue to finish my degrees in

4    psychology and social work so I can hopefully counsel without

5    felony or certification issues.  I have things in my favor, a

6    plan, family behind me, and someone willing to help.  So all

7    hope isn't lost.  Maybe I always think the worst of myself.

8    It's in my make-up no matter what.  Naturally, I'm anxious

9    about making this change in my life, because I'm potentially

10   exposing myself to a whole world of emotional pain, which,

11   incidentally, is exactly what I've been trying to avoid.

12       Of course, there are obstacles.  However, I'm more

13   concerned with the future, where I envision myself, and where

14   I want to be.  Your Honor, I'm not a lost cause.  I never was.

15   I just lost my way.

16       Thank you, Your Honor.

17           THE COURT:  Okay.  I think the defendant and her

18   attorney recognize the problem, that the government's already

19   given her a ten year benefit for her cooperation by the way

20   they charged her.  So she's already had a downward departure

21   of ten years in that sense.

22       What is your thought as to how the Court should take that

23   into account?

24           MR. JUMES:  Your Honor, we certainly understand that

25   the idea of starting this whole process at 240 months because

1    that's the statutory boundary is absurd and salacious.  We do

2    think that with the substantial cooperation and with the level

3    of contrition that a sentence beneath 20 can still satisfy

4    3553.  How far that should be is, obviously, in your hands,

5    and I don't know how to more directly answer it than that,

6    Your Honor.

7              THE COURT:  Well, that's been happening too often in

8    these cases where the government gives a benefit by the way

9    they charge and then file a motion for downward departure, and

10   that creates some difficulties.

11       She doesn't have a bad criminal history, which -- she has

12   a criminal history, but it's not as bad as many that have been

13   involved in these drug conspiracies.  I can tell from the

14   description of some of the offenses, she wasn't actually

15   convicted of them, that she committed those offenses.  So she

16   has maybe more of a criminal history than her -- criminal

17   history category she gives.

18       I'm going to give her a reduction of below the bottom of

19   what is a somewhat fictional advisory guideline range of 240

20   months.  I'm going to reduce that down to 220 months, which

21   when you look at the reduction below what should have been the

22   bottom of her guideline range, 360 months, is quite a

23   reduction.

24       I'm going to combine that with a term of supervised

25   release of three years, and that will start once she's

1  completed her sentence of imprisonment in this case and

2  payment of a special assessment of $100.  I think a sentence

3  of the kind I've described appropriately and properly takes

4  into account the cooperation the defendant's provided to the

5  government and all the factors the Court should consider in

6  sentencing under 18, United States Code, Section 3553(a).

7  So the Court's ordering and adjudging that the defendant

8  be committed to the custody of the Bureau of Prisons to serve

9  a term of imprisonment of 220 months.  I'm also ordering that

10  the defendant serve a term of supervised release of three

11  years to commence when she's completed her sentence of

12  imprisonment and that the conditions of that supervised

13  release will be the standard conditions that will be set forth

14  in the judgment of conviction and sentence and the following

15  additional conditions:

16  She shall not commit another federal, state, or local

17  crime.  She shall not possess illegal controlled substances.

18  She shall cooperate in the collection of DNA as directed by

19  the probation officer.  She shall refrain from any unlawful

20  use of a controlled substance and shall submit to one drug

21  test within 15 days of release from imprisonment and at least

22  two periodic drug tests thereafter as directed by the

23  probation officer pursuant to the mandatory drug testing

24  provision of the 1994 Crime Bill.

25  She shall participate in mental health treatment services

1    as directed by the probation officer until successfully

2    discharged, and those services may include prescribed

3    medications by a licensed physician.  She shall contribute to

4    the costs of those services at the rate of at least $15 a

5    month.

6        She shall participate in a program approved by the

7    probation officer for the treatment of narcotic or drug or

8    alcohol dependency that will include testing for the detection

9    of substance use, and she shall abstain from the use of

10   alcohol and all other intoxicants during and after completion

11   of that treatment and shall contribute to the costs of those

12   services at the rate of at least $25 a month.

13       I'm also ordering that she pay a special assessment of

14   $100.  That's payable immediately to the United States of

15   America through the office of the Clerk of the Court here in

16   Fort Worth.

17       Ms. Risovi, you have the right to appeal from the sentence

18   I've imposed if you're dissatisfied with it.  That appeal

19   would be to the United States Court of Appeals for the Fifth

20   Circuit.  You have the right to appeal in forma pauperis.

21   That means without any cost to you if you were to qualify for

22   it.  You have the right to have the Clerk of the Court file a

23   notice of appeal for you, and the Clerk would do that

24   forthwith if you were to specifically request it.

25       You and your attorney have been given a form that outlines

16

1    certain rights and obligations in reference to an appeal.  If

2    you haven't already done so, I want the two of you to review

3    it and be sure you understand it, and once both of you are

4    satisfied you understand it, I want both of you to sign it and

5    return it to the Court coordinator.

6        Has that been done?

7            MR. JUMES:  It has, Your Honor.

8            THE COURT:  Okay.  The defendant is remanded to

9    custody, and the attorneys are excused.

10           MR. JUMES:  Your Honor, for the record, I know my

11   client requested it.  We wanted to formally request a

12   recommendation for the RDAP program or some sort of treatment,

13   and if you made that a part of the order --

14           THE COURT:  Well, I think I will recommend that in

15   her case.  I recommend that she be permitted to participate in

16   what they call a long term -- use to call it a long term drug

17   treatment program.  I think it's now called what you called

18   it.

19           MR. JUMES:  Thank you very much, Your Honor.

20           THE COURT:  Okay.

21       (End of proceedings, 12:30 p.m.)

22

23                            -oOo-

24

25

17

I N D E X

| Witnesses: | Direct | Cross | Redirect | Recross |
|------------|--------|-------|----------|---------|
| Brian Finney | 4 | 6 | | |

-oOo-

CERTIFICATE

    I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter, and that the transcript was prepared by me and under my supervision.


s/  Ana P. Warren                              November 27, 2017
Ana P. Warren, CSR #2302                              Date
U.S. District Court Reporter